21-2206 U.S.A. v. Donald LaGuardia Good afternoon, your honors and may it please the court. My name is Daniel Noble and I represent the defendant appellant Mr. Donald LaGuardia who is present in court today. I did not represent Mr. LaGuardia down in the trial court below. And I'd like to reserve with the court's permission two minutes for rebuttal. The court should reverse Mr. LaGuardia's conviction because the meager evidence of the defendant's criminal intent was insufficient as a matter of law to prove beyond a reasonable doubt and sustain his guilty conviction. At a minimum, this court should vacate Mr. LaGuardia's conviction and remand for a new trial. In light of the thin circumstantial evidence of Mr. LaGuardia's criminal intent, coupled with the substantial compelling evidence of his good faith, the district court's errors below, which we've raised here on appeal, all of which bore directly on the court question at issue at trial whether Mr. LaGuardia acted in good faith, rendered the district court's errors highly prejudicial to Mr. LaGuardia. Considered cumulatively, these errors undermine Mr. LaGuardia's right to a fair trial and his ability to present a fair defense. Accordingly, this court should correct that injustice. In addition and separately – and lack of good faith, including the diversion of investor money to the manager's knowledge of the manager's difficult financial situation, the proximity in time between misrepresentations and the misuse of the funds, disregarding Schnell's concerns. Why isn't that sufficient evidence? Your Honor, all of that evidence obviously is circumstantial evidence, and we recognize that conviction and proof of intent can be sustained on circumstantial evidence alone. However, that evidence, even taken cumulatively, we would submit was speculative. The government's proof boils down to essentially three pieces of evidence, which you recited, Judge Chin. First, with respect to the use of the money from the fund to pay for the expenses, there was substantial evidence at trial that Mr. LaGuardia accounted for that as a receivable. That was one of the key issues. So was borrowing money from the fund consistent with the representations he had made to the investors about how their money would be used? Well, Your Honor, I don't think there was any representation in the documentation provided to investors or in the evidence that was presented regarding Mr. LaGuardia's statements to investors about the receivable practice. No, no, nothing, but I thought there was evidence that he had represented that your funds are not going to be diverted for management expenses and other things. They're going into the investments. He told that to someone. Yeah, am I misunderstanding the evidence here? Well, I believe there was testimony from one of the investors, Mr. LaGuardia, to that point. Mr. LaGuardia obviously disputed that that is what he said. However, with respect to the use of the funds, I believe there were representations in the PPM which indicated that there would be a management fee charged, but there were oral communications to the investors that because this was a startup fund that the management fee would be waived. And with respect to the use of the funds, this was an accounting mechanism. The setting up of the receivable was used to account for the fact that eventually the management company intended to repay the money that was being used. And the only funds, and I think this is a key point, the only funds that were being used was money that was essentially advanced by the management company on behalf of the funds because of the representation that had been made that we're going to cover all of these expenses because this is a startup. So there was every intention. I mean, an account receivable doesn't grow in value through investment. An account receivable just sits there on the books. I don't think that the representation was that you're going to invest in our fund and then we're going to loan that money to ourselves but pay it back someday. Right? I mean, that may show an intent to pay it back, but I'm trying to figure out whether that undermines the notion that the diversion evidence is a misrepresentation at the outset at the time the funding was solicited. Your Honor, I think even assuming that there was some misrepresentation or it was at least a gray area about how the money was going to be used or not used, I think the thrust of our argument is that there was still insufficient evidence of criminal intent, which is a separate element of all the three different fraud offenses. And does the government have to prove that the defendant knew that his conduct was illegal or do they have to prove that he made affirmative misrepresentations to people when they invested by leading them to believe that the money was going into the fund when he intended to loan them and maybe pay them back and hopefully pay them back? Two separate elements. One, an affirmative material misrepresentation or a material omission of fact that the defendants had an obligation to disclose. And a separate element that he acted with criminal intent. And that's really where the thrust of the Rule 29 motion and our argument here on appeal. Because of what we submit as thin evidence, the court has to view all the evidentiary errors that we've raised here. And I think the most important one being the district judge's extensive, essentially cross-examination of Mr. LaGuardia. Was that objected to at the time, the district court's questioning? No, Your Honor. The government's accuracy was not objected to at the time. However, in this court's decision in Filani, which is remarkably similar to what occurred here, the court found that the district court's interrogation, questioning of the defendant at that time still constituted plain error. And so we would submit that we do meet the plain error standard here. And it was substantially prejudicial to Mr. LaGuardia, the district court's interrogation. The district court's questioning to me looked like efforts to clarify testimony and not to really conduct a cross-examination. Is there one interchange that you'd point to as particularly egregious? Well, we would respectfully disagree with that characterization. That's the way the government tries to paint it in the best light. One thing that we would point Your Honor to is the district judge asked a hypothetical about the use of how a judgment in favor of investors against the fund would have been used. I think the use of hypotheticals and really probing the defendant during his own direct examination crosses the line that this court has set in cases like Filani for where a court's questioning can be helpful to a jury in clarifying versus where the judge is picking up the mantle of the assistant and basically becoming a third assistant United States attorney. And we think it's remarkable here, if you look at the transcript, the judge's what we call cross-examination of Mr. LaGuardia was just as lengthy as the government's own cross-examination. The district judge really did a lot, which we would submit, to undermine the credibility of Mr. LaGuardia's testimony. And we believe that's the… The district judge was pretty active with the government's witnesses too, right? Well, Judge Tinn, I mean, we would respectfully disagree with that. And just taking the government's cooperating witness as an example, the district judge asked a clarifying question or asked the witness to repeat himself. But then on cross-examination, the district judge actually undermined a point that defense counsel scored about relating to the receivable, such that the government didn't even feel the need to get up and do any kind of redirect, which I think sends a powerful message to the jury. And obviously, when the district judge begins asking questions of a defendant, a jury's ears are going to perk up. And they're going to pay close attention to that. And we would submit that taken as a whole, the district court crossed the line into being an advocate versus being just asking clarifying questions. I see that my time is up, but we would reiterate that the other errors that we point to as well, taken in light of the weak circumstantial evidence of Mr. LaGuardia's intent, warrants a new trial here. Thank you. Thank you. Mr. Rossmiller. Thank you, and may it please the court, my name is Alex Rossmiller. I'm an assistant United States attorney in the Southern District of New York, and I represent the government in this appeal. The defendant's arguments here lack merit, and the jury verdict and Judge Kaplan's imposition of forfeiture should be affirmed. The evidence in this case proved that the defendant engaged in a scheme to defraud investors in his investment funds, specifically by committing securities fraud, investment advisor fraud, and wire fraud. The proof was straightforward and overwhelming and included, as acknowledged by appellant, witness testimony and voluminous documentary evidence. In sum, the defendant lied to investors repeatedly over the course of years. He was convicted and sentenced because of those lies, and the conviction and sentence should not be disturbed by this court. First, and beginning with the issue that was the focus of counsel's argument today, sufficiency is obviously a high bar to meet. The conviction should be upheld if any rational juror viewing the evidence in the light most favorable to the prosecution could have found the essential elements beyond a reasonable doubt. At trial, the government called two investors whose testimony plainly showed that the defendant had lied to them. The government also called the investment advisor's former director of operations, Mr. Schnell, who testified about the transfers from the frontier funds to LR managers that LaGuardia directed, and documents also showed that LR managers used investor money from frontier funds to pay for operating expenses as well as payments directly to LaGuardia, and also that LaGuardia diverted certain investor funds before they ever got to frontier. In short, these uses of investor funds were inconsistent in representations to investors, including in the written private placement memorandum. Turning briefly to the issue of the district court questioning, as the court pointed out, these were clarifying questions to which there was no defense objection. There were a small proportion of the questioning on complicated subjects to clarify, and, in fact, at the end of one of the court's colloquies, the court said to defense counsel, quote, you see what I'm getting at. I know. Go right ahead. And defense counsel said, I do, and proceeded to ask additional questions. Let's talk about the other one, though. It was brief, but it strikes me as a little bit more Filani-like in the sense that there's a question about what did the investor get in return for the investment, and the answer is a diversified portfolio. And then the court first jumps in and says, no, no, I want to know what he got for it. There's an answer. Counsel's trying to elicit the testimony. What gives him exposure to the diversified portfolio? And without even waiting for the answer, the court jumps in. No, look, he didn't get the diversified portfolio, did he? He had no ownership directly in any diversified portfolio, did he? He became a limited partner in an entity that may involve the diversified. Isn't that true? Doesn't that sound pretty prosecutorial? I don't think it does, Your Honor. I think it is a set of clarifying questions, and I think the defendant ultimately did clarify that the court was correct in its clarification. In other words, this was not sort of an attempt to go with the credibility of the defendant or to suggest that he had been lying. It was a clarification of a complicated subject. Even if it was criticism, Your Honor, or even if it was a series of questions that went to credibility, as discussed in the government's brief, there was a limiting instruction. This was not the kind of impression of partisanship that cannot possibly be cured by an instruction. Indeed, if anything, it was the exact kind of brief or minor departure, at worst, that a curative instruction resolved. And again, obviously, it's a plain error review given no objection, which gives rise to the inference that there was no prejudice at all. I'm happy to discuss any of the other issues. Could you talk about forfeiture, please, and the basis for the forfeiture calculation? I was a little not certain that I could find anything in the record to support the figures that were ultimately relied on. I certainly can, Your Honor, and I appreciate the question. So just at the outset, the district court is entitled to impose forfeiture based on evidence presented by the parties at sentencing. The determination may be based on evidence already in the record, including a plea agreement and any additional evidence submitted. So in the first instance, that includes information set forth in a signed consent order of forfeiture or other stipulation that's set forth in our brief at 5253. That's Booker. It's a preponderance of the evidence standard. And I will get to the specific numbers, but I also wanted to note that there is clearly waiver here. We're not aware of any doctrinal reason why there couldn't be waiver. And not only did the defendant consent and agree to the forfeiture amount, he used that in his argument for leniency at sentencing. So the record at 820, the defendant argued at sentencing, quote, the purpose of deterrence here, I think that anyone who looks at what Mr. LaGuardia has had to deal with over the last several years and what has happened to his family over the past several years and who looks at the enormous forfeiture figure here, which is, I think, $2.5 million, all those things together I think are adequate to basically satisfy the goal of general deterrence. So first of all, we think that the court did look at the figures that it needed to, that there is waiver, and also to slightly belatedly get to the court's question, the numbers are set forth in the PSR. There is the $400,000 amount that is set forth at page 26 of the PSR. I think respectfully there is a slight error in appellant's brief where it describes a government objection to the PSR and no resolution. It's actually a defense objection to the PSR, which remains unchanged. The government provides an explanation. And it does get into the weeds in terms of the dollar amounts. There is the $370,000. That's January 2014 at page 6 of the PSR. I'll also note slightly more. You just said $370,000. And one of the things that I'm not looking at it right now, but I thought the PSR said $390,000. I was having a hard time getting these numbers to match. And I thought that the government came in and said, actually, there was $800,000 in that investment from investor number one. And the entire $800,000 or perhaps $400,000 plus $370,000 of it went to purposes other than what they were intended for. Am I misunderstanding the government's position on that? I don't think you're misunderstanding the government's position. I would say, again, just at the outset, this was a stipulated agreed-to amount in the first place.  It also is a subset of a larger number, I think, all of which could have been used for forfeiture based on the record. Nevertheless, with that framework in mind, I do want to answer the court's question directly, which is there is a $400,000 amount that the defense says should be $390,000. That's a $400,000 amount that was not used for what it was claimed it would be used for. In other words, that is $400,000 of loss. $390,000 of it gets moved separately. So it is slightly complicated. I would refer the court to the testimony site in our brief. But it is also set forth in the PSR. It has to be cobbled together slightly. But the PSR uses the $390,000 figure, not the $400,000 figure. That's what I'm— It does in that particular site. But the $390,000 is basically the vast majority of and a part of the $400,000 that was not allocated to what it should have been. Right. And there's another sort of movement of $300,000. And was there another $400,000? Was the $390,000 a subset of $800,000 that Investor No. 1 invested at that time? The way I was reading the government's objections to that paragraph in the PSR, the government's description, was that not only was the $390,000 right, or maybe it should have been $400,000, but that the other $400,000 as part of that $800,000 package went the wrong place. Am I misunderstanding that? I'm not sure, Your Honor. But what I'll say is I think that it counted the $400,000, of which $390,000 is a subset. There's a separate additional $370,000 that is described separately. Okay. The defense also, or I should say the appellant here, cites to page 37 that says the forfeiture includes, quote, at a minimum of $1.9 million. That obviously was still being determined. So the numbers were, I think, still sort of in play and being calculated at the time of the PSR. Did the PSR expressly set out, when it's setting out its various pieces, there's this $600,000 figure, which I understand to be the 2014 investment from Investor No. 1, Mr. Wilson, that I don't find accounted for in the PSR's tally of the different pieces, but I see the government in its responses mentioning it a couple places. Can you tell me about that, if you know? What I would say, Your Honor, is the PSR is not the be-all and end-all of the calculation. And so as I stand here, I don't specifically recall that particular calculation. But I'll say that it's not a question of whether all of this is specifically delineated and finalized in the PSR. As I just mentioned, the minimum forfeiture that it discusses is obviously a number in progress. It's not uncommon for forfeiture to not be fully determined in the PSR and for it to be finalized later. The larger question is whether the court is entitled to impose forfeiture based on evidence including, but not limited to, the PSR. And so again, more broadly, the determination can be based on evidence already in the record, in particular including the consent order. Subject to any other questions, I'm happy to rest on our submissions. Thank you. I'd like to pick up where Mr. Ross-Miller left off with forfeiture. And we also struggled in reviewing the record to find sufficient support for the forfeiture figure. Obviously, that's the basis for our claim. Mr. Ross-Miller said that if it's, you know, it doesn't have to be in the PSR, but the government has really- What's your basic response initially to the waiver argument? So we don't believe that the consent order waived. Mr. LaGuardia is right to have forfeiture entered in an amount that was supported by a preponderance of the evidence. And we would point the court to, it's a summary order of this court, but the Arbel decision where the court overturned a forfeiture order where the judge had ordered $20 million in forfeiture because there was a consent order saying that there could be forfeiture up to $20 million. You know, we submit that under Rule 32.2, the district court has an independent obligation to correctly calculate the forfeiture order. And we obviously concede that here we're on a plain error standard. But we would submit that entry of a forfeiture order that's approximately, by our calculation, $880,000 more than what the government proved would constitute plain error and would be plainly unjust. And one other point- Well, what about the argument that the fraud here was not in actually in the diversion. It was in the procurement of the funding to begin with, with the intent to improperly divert it. And so, therefore, all $6 million plus of the investment is fair game for the forfeiture order. And your client got off easy because he only had to pay $2.5 million. Well, first, the government did not seek that amount down below. So the district court didn't make any findings relating to that. And the government points to, I believe, three different paragraphs or four different paragraphs of the PSR, paragraph 16 and then 32 through 34 to support that proposition. But the PSR doesn't actually prove that all $6.5 million was fraudulently obtained. In fact, the government concedes that some of the money was properly invested. So I don't see how the government can now claim that all of the money could have been subject to forfeiture and, therefore, some lesser amount, even if we didn't put in the record below, sufficient evidence to prove that amount can be sustained. What's hard on appeal, though, is in the face of this stipulation. There's conflicting arguments about what the numbers are. And then we have this signed document saying, I agree that this is the number, and you can issue it. The court, understandably, wouldn't have held a hearing. It wouldn't have tried to resolve these evidentiary conflicts because it had a stipulation. But now in appeal, we're essentially being asked to do the same thing that the court didn't have the opportunity to do because there was a stip. I understand, Your Honor. And I would submit that that doesn't constitute waiver. It constitutes plain error. And, therefore, this court has to determine whether plain error occurred such that the question of forfeiture should be remanded for further fact-finding. And we submit that it would. And I know my time is up, but I do want to go back to the argument regarding the judge's cross-examination because I do think that's one of the strongest points that we have as to why Mr. LaGuardia was denied a fair trial. So, obviously, his testimony was critical to his defense of good faith. He was the only defense witness who testified, and so that's very similar to this court's decision in Filani. By repeatedly interrupting Mr. LaGuardia's testimony, by asking hypotheticals, by posing leading compound questions, as Judge Robinson, you pointed out, about the investment by Mr. Harris and what exactly he was getting, the judge was essentially undermining, serving as a prosecutor, Mr. LaGuardia's credibility before the government even had to stand up and cross-examine him. And the government submits that the boilerplate jury instructions, remedial instructions, were sufficient, and we submit that it's not in this case, that the instructions may correct questions from a judge that are of a more clarifying nature, but in this case, the intervention was extensive. I think we have your argument there unless there are further questions. And compounded with the other errors we submit, it justifies a new trial. Thank you.